**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | |
|---|---|
| RAYMOND COVINGTON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) NO. 1:97-0013 |
| | ) JUDGE HAYNES |
| DAVID G. MILLS, Warden, | ) |
| | ) |
| Respondent. | ) |

**MEMORANDUM**

This action is before the Court upon remand from the Sixth Circuit to consider

Petitioner's claims that his trial counsel was ineffective for his failures: (1) to investigate the

case; (2) to seek expert assistance to enhance the quality of a tape recording the State introduced

at his trial; (3) to provide adequate counsel about Petitioner's right to testify at his trial; and (4)

to object to a hand-written amendment to the indictment setting forth the charges at his trial.

Covington v. Mills, 110 Fed. Appx. 663, 665-66 (6th Cir. 2004).

**A. Findings of Fact**

Petitioner was convicted of one count of first degree murder and one count of armed

robbery by a jury in 1991 for which he received concurrent sentences of life imprisonment and

ten years imprisonment, respectively. On appeal, Petitioner's convictions were affirmed.

(Docket Entry No. 12, Addendum No. 1, Attachments). The Tennessee Court of Criminal

Appeals summarized the facts[1] at the Petitioner's trial as follows:

_____

[1]State appellate court opinion's findings can constitute factual findings under 28 U.S.C. §
2254(d). Summer v. Mata, 449 U.S. 539, 546-47 (1981).

This case concerns the killing of Ernie Anglin on April 14, 1979. Bonnie Parker, the mother of Mr. Anglin's daughter, was living with Mr. Anglin on the date of his death. According to her testimony, two masked men entered their house at approximately 9:30 p.m. Brandishing weapons, they took a substantial amount of cash from Anglin's pants pocket and then led him out of the house while pointing a gun at his back. The victim's four-year old daughter was a witness to this robbery and abduction. The little girl was crying hysterically while her mother, Ms. Parker, desperately sought help. She called a friend; but before anyone arrived, Ms. Parker heard two gunshots from across the street. Shortly thereafter, Ernie Anglin was found dead on the ground with two gunshots to his body.

Sheriff's investigations led to Greg Hill as a possible suspect. Hill made a statement to law enforcement officers implicating himself, the appellant, and a man named Ronnie Brown. Hill agreed to allow himself to be wired and to engage in a conversation with the appellant. The conversation was videotaped and recorded. During the taped conversation, the appellant admitted robbing and shooting Anglin. The court reporter had difficulty hearing every word of the tape and would certify the transcript of the recording as a "best effort" only. According to the court reporter, a portion of the tape was as follows:

Mr. Hill: Hey, Ray-Ray?

Mr. Covington: What?

Mr. Hill: There's something I always wanted to ask you.

Mr. Covington: What?

Mr. Hill: That night you shot old Ernie, that night, --

Mr. Covington: Uh-huh.

Mr. Hill: -- You didn't mean to shoot the mother-fucker, did you?

Mr. Covington: No, I told you he backed into the gun.

Mr. Hill: He backed into the shotgun?

Mr. Covington: Oh, you know, I had him, and we was walking out with him. Right? Right? I

2

was behind him and he was in front of me.

Mr. Hill: Uh-huh.

Mr. Covington: And he stopped. An I'm looking
back, and not paying attention to him, and
when he stopped, I'm, like that there, jammed
into him, and the mother—fucker went off. * *
Think I was trying to kill him? No, I
wasn't trying to kill him.

Mr. Hill: Well, see, somebody, they thought,
at one time that Ronnie had a contract on him.

Mr. Covington: Yeah.

Mr. Hill: You know, Ronnie was going to get
some money off of him.

Mr. Covington: You don't think I wanted to
kill him? Shit.

Mr. Hill: I know that's right.

Mr. Covington: I done got what I wanted and
got out of there.

Mr. Hill: I know that's right.

Mr. Covington: No, that mother-fucker stopped,
man. He stopped.

Mr. Hill: I figured that what it was.

Mr. Covington: When he stopped --

Mr. Hill: An accident.

Mr. Covington: When he stopped, I nudged him, 'cause, hey, it scared me.
. . . Yeah, he stopped and he nudged that shotgun, and when it went off,
you talking about--got where    I panicked. It scared me, more than it did--
well, it didn't scare him, 'cause he was through.

Mr. Hill: (Laughter.) It was all over for him.

3

Mr. Covington: It scared the hell out of me.

Mr. Hill: He was dead then.

Mr. Covington: That mother-fucker went off twice, quickly.

Mr. Hill: I though I heard two shots.

Mr. Covington: That's an automatic. That's one of them automatics

The videotape as well as the taped recorded conversation was played for the jury. Greg Hill testified at trial. In March of 1979, he, Ronald Brown, and Ray Covington made plans to rob Ernie Anglin, who was know to carry large sums of money. They selected April 14th as the date of the robbery. They met at Brown's apartment at 7:00 p.m. to discuss the robbery. They left the apartment carrying a shotgun, a pistol, and two ski masks. Hill testified that at approximately 8:30 he dropped the other two off near Anglin's house. Thirty minutes later he heard two shots. Brown and Covington came running back to the car and as they got in, Hill drove off. Brown and Covington were arguing. Brown stated, "you done killed him"; and Covington replied that he didn't mean to, that the gun went off accidently. Hill testified about wearing the hidden microphone and engaging in a conversation about the homicide with the appellant. Hill further testified that the excerpts from the transcript [as set forth above] essentially represent the conversation that he remembers. The appellant testified on his own behalf. His explanation of the events of April 14, 1979, is vague and somewhat confusing. A summary of his testimony is as follows: Hill and Riley Cooper went to the appellant's house to get a shotgun the appellant had borrowed from Ronnie Brown. The appellant refused to give the gun to the two men, but said he would go with them to take it back to Brown. Hill drove to a spot near Ernie Anglin's house; Hill and Cooper got out of the car; and appellant stayed in the car. He contended that he was unaware of the reason for stopping near Anglin's house. The appellant then got out and took the path the other two men had taken. He saw them with Ernie Anglin. Cooper was behind Anglin with a shotgun. The appellant contends that he [appellant] bumped into the shotgun and it went off twice, then they all ran back to the car.

(Docket Entry No. 12, Addendum No. 1 thereto at 1-5).

As to other relevant facts, Petitioner notes, without objection, that the investigation of

Anglin's death was unresolved for many years, citing the lack of eyewitnesses and fingerprints

4

on the shotgun that killed Anglin. Greg Hill, a suspect, was interviewed several times during

the initial investigation and failed a police-administered polygraph test. Hill, however, initially

disclaimed any knowledge of Anglin's death. Riley "Lee Darling" Cooper was also a suspect

given his recent argument with Anglin over money Cooper owed Anglin, but refused to pay. At

the time of Petitioner's trial, Cooper had died. (Docket Entry No. 99, Addendum No. 1 at p. 47).

At trial, Brown asserted an alibi that he was elsewhere on the evening of the Anglin's death.

Brown had earlier passed a police-administered polygraph test on whether he had any

involvement in Anglin's robbery and death.

In the interim, Hill had been convicted of check fraud and to avoid trial, Hill initially

pretended to be mentally ill. Hill later told police officers that he had information about the

Anglin's murder and the police arranged for a tape-recorded conversation between Hill and

petitioner that the Tennessee Court of Criminal Appeals quoted, as stated earlier.

The issues addressed at Plaintiff's state post-conviction proceedings on Covington's trial

counsel's performance are reflected in the Tennessee Court of Criminal Appeals opinion:

> The petitioner testified that his counsel was ineffective as follows: (1) by
> rarely contacting the petitioner and by meeting with him only twice, for a total of
> approximately 45 minutes; (2) by failing to have the tape-recorded conversation
> between the petitioner and State witness Greg Hill professionally enhanced,
> because portions of the tape were unclear; (3) by failing to conduct a follow-up
> investigation of a letter written by Pete Bondurant to his brother, Pat, concerning
> Hill; and (4) by failing to call three witnesses who would have testified favorably
> for the petitioner.
>
> The petitioner's trial counsel, appearing as a State witness, testified at the
> evidentiary hearing that he had expended a great deal of time preparing the
> petitioner's case. He remembered filing a motion to suppress the statement of
> co-defendant Hill, consulting with a gun expert, viewing the crime scene, and
> interviewing most of the State's witnesses. He acquired helpful information from
> counsel representing Hill. Trial counsel recalled that he had been readily
> accessible to the petitioner and denied that he had met with him for only

5

forty-five minutes before the trial. He estimated that he had counseled with the petitioner for at least four hours, a contention supported by office time records. At the conclusion of the evidentiary hearing, the trial court took the matter under advisement and ultimately ruled that the petitioner had been effectively represented. These findings of fact must be considered as conclusive for purposes of appeal unless the evidence preponderates against them. See Graves v. State, 512 S.W.2d at 604. In our view, the record fully supports the determination of the trial court.

Trial counsel explained that he chose not to hire an expert to enhance the quality of the taped conversation between Hill and the petitioner as a matter of strategy. He believed that a more accurate transcript might have further incriminated the petitioner. The poor quality of the tape offered the petitioner an opportunity to impeach Hill about the tape.

Trial counsel also explained his decision not to call Pete Bondurant as a witness. Bondurant had written a letter to his brother, Pat, in which he claimed that Hill had said that "he wasn't going to take no fall so long as the D.A. was a sucker." While this statement would have cast doubt upon the truthfulness of Hill's testimony, trial counsel was concerned about the credibility of the Bondurants; both were in jail on second degree murder charges at the time of the communication. Pete Bondurant would have been fair game for impeachment by his prior criminal record. Trial counsel believed that any possible success in the trial hinged upon the credibility of the defense and that the Bondurant participation presented a risk to that strategy.

Trial counsel could not remember why he chose not to call Fred Alexander, a witness subpoenaed by the defense. Thus, counsel may have been deficient in performance. Alexander, however, was not called was a witness at the post-conviction hearing. Thus, petitioner failed to establish who Alexander was or what his testimony would have been; no prejudice has been shown.

Counsel also testified that, as best he could remember, Officer Hall would have been unable to provide helpful information. Moreover, the petitioner also failed to call Officer Hall as a witness at the post-conviction hearing. Thus, we are unable to determine how the omission affected the results of the trial.

The petitioner's girlfriend, Amena Comings, was not called because trial counsel concluded that much of her testimony would have been inadmissible. Because he believed the petitioner had made a very good witness, counsel chose, again as a matter of strategy, not to call Ms. Comings. While Ms. Comings attended the evidentiary hearing on the petition for post-conviction relief, she did not testify. Thus, the petitioner has again failed to establish how he might have been prejudiced.

6

<u>Id.</u> at Addendum No. 2 pp. 3-5.

### 1. Trial Counsel's Failure to Investigate

In addition to the Tennessee Court of Criminal Appeals' factual findings, Petitioner cites other proof from the state post-conviction hearing on Petitioner's claims before the Court. <u>Id.</u> at Addendum No. 1. For his claim that his counsel failed to conduct an adequate pretrial investigation, Petitioner's counsel's time sheets reflected that he spent three and a half hours to four hours with Covington. <u>Id.</u> at 22, but his counsel stated that he spent more time than that with Covington. <u>Id.</u> at p. 23. As to his time records, trial counsel's time records were not contemporaneously recorded and are not necessarily accurate, <u>Id.</u> at p. 14, and did not assist his counsel's memory. <u>Id.</u> at p. 21.

Petitioner's trial counsel did not contact witnesses in the neighborhood where Anglin lived, nor determine whether Riley "Lee Darling" Cooper was involved in the murder, as Covington contended. <u>Id.</u> at p. 46-47. Petitioner's trial counsel did not attempt to corroborate Covington's explanation by investigating Cooper's whereabouts at the time Anglin was killed, to show that Cooper and Hill were seen together near the time of Anglin's death. Petitioner argues that if trial counsel had done so, he would have discovered that Cooper owed Anglin money for at least a year and refused to pay and that Anglin had recently, confronted Cooper, argued with him about the debt, and stated that he "ought to whip [Cooper's] ass". There is no proof from such witnesses or their testimony. At the time of trial, Cooper was dead. <u>Id.</u> at 47.

Prior to trial, Howell subpoenaed witnesses whom he could locate including John Morris, a former co-defendant of Covington's, Frank Alexander, Walter Hill and Amena Comings. <u>Id.</u> at pp. 16-19. Howell also spoke with a J.R. Bailey and Frank Duncan. <u>Id.</u> at pp. 21 and 59.

7

Morris, Duncan and Howell testified at trial. Id. at pp. 68-69. Howell met with Anglin' sister who had a tape of someone who drove by the scene of the murder. Id. at p. 48. In Howell's opinion, this witness's testimony would be favorable to the State. Id. at p. 48.

Covington's counsel obtained through discovery, Hill's interview and statements to detectives and the corner's report on Anglin. Id. at p. 45. Covington's counsel researched Hill's criminal record. Id. at pp. 33-34. Covington's counsel shared with Covington the transcript of Hill's statement to the police, id. at p. 45-46 and the preliminary hearing transcript. Id. at pp. 74, 86. William Hill, Greg Hill's brother had died. Id. at p. 77. Howell talked to Greg Hill's wife. Id. at p. 89.

Trial counsel was aware that, despite Hill's story to the contrary, Brown, Covington's co-defendant, denied participating in the robbery of Anglin. Although trial counsel was aware that co-defendant Brown gave substantially the same explanation of events as Covington, trial counsel never pursued Brown's testimony at trial, and never investigated or obtained Brown's earlier statement of alibi witnesses who could have testified that he was not at the scene of Anglin's murder. Id. at 49-50. Through Brown's counsel, Covington's counsel knew that Brown would testify only that Covington had borrowed his shotgun. Id. at p. 49. Covington's trial counsel called two law enforcement officers to testify and elicited testimony that the police had received evidence and information that Brown had been seen with a shotgun standing over Anglin's body.

Before trial, Covington provided his trial counsel with a letter from Pete Bondurant, an inmate at the Lawrence County Jail where Hill also was incarcerated. Id. Before Covington's trial, Hill was bragging to inmates in Lawrence County Jail about pulling a fast one on the

8

district attorney's office. The letter, dated 2/22/91, read as follows:

> Tell Ray-Ray that Mother-Fucker Hill is sitting in the Second Drunk
> Tank of the Lawrence County Jail reviewing notes Bottoms gave him
> yesterday. Trusttees told me they were all over the fucking place.
> Hill told me "He wasn't going to take no fall so long as the D.A. was
> a Sucker." Man that Motherfucker is Treacherous.

(Docket Entry No. 99, Second Supplemental Addenda, Volume 1, Addendum No. 1, Post-Conviction Transcript, Exhibit 11). Howell did not interview Bondurant or any witnesses or trustees at the Lawrence County jail about Hill, Id. at p. 35, despite Covington's request. Id. at 67. Counsel chose not to call Bondurant because of Bondurant's criminal conviction for murder and because Bondurant "was the most famous murderer in this area for several years back." (Docket Entry No. 99, Addendum No. 1 at p. 56).

Petitioner's trial counsel also did not seek funds to hire an investigator to assist in preparation of a defense, (Docket Entry No. 99, Second Supplemental Addenda, Volume 1, Addendum No. 1, Post-Conviction Transcript, Gary Howell at p. 11), but shared legal research with Brown's counsel.

## 2. Counsel's Failure to Enhance

Trial counsel concedes that he did not seek any expert evaluation of the tape-recorded conversation between Covington and Hill, the state's key witness. At trial, Hill and the state cited Covington's inculpatory words on the tape, but as the Tennessee Court of Criminal Appeals noted, Covington's counsel also used the tape to support the defense's theory.

Covington insists that his statements on the tape differed from the prosecution's and Hill's description. In his view, the tape included statements that Covington accidentally bumped into the shotgun held by Cooper, causing the gun to accidentally discharge and Cooper

9

to kill Anglin. During its deliberations, the jury requested and was permitted to listen again to the critical portion of the tape-recorded conversation between Covington and Hill. This tape was not enhanced for this proceeding.

### 3. Counsel's Failure to Advise Covington on his Trial Testimony

Despite his reservations, Covington testified at trial that on April 14, 1979 Hill and Cooper came to his house and told him that Ronnie Brown wanted his shotgun back from Covington, who had borrowed the shotgun several weeks earlier. See Docket Entry No. 12, Addendum No. 2 at p. 5 and Docket Entry No 99, Addendum No. 2, Trial Transcript at pp. 327-360. Covington thought it was strange that Brown asked someone else to pick up his gun, so Covington went with Hill and Cooper to deliver the gun to Brown. Id. Covington then accompanied Hill and Cooper in Hill's vehicle to the Bel Air neighborhood, where, according to Hill and Cooper, Brown was playing craps at Anglin's house. Id.

Hill and Cooper then told Covington to wait in the vehicle while they went inside to give Brown the shotgun, because Anglin did not like people to bring strangers into his house. Covington waited for a while in the car, but got impatient and concerned with the delay and left the vehicle to see what was causing the delay. As he started to look for Hill and Cooper, Covington saw Officer Frank Duncan pass by in a police car, flashing his light into Hill's car. Id.

As Covington continued to walk toward Anglin's house, he saw Hill, Cooper, and another individual (later identified as Ernie Anglin) walking away from the house. Hill was walking in front, followed by Anglin. Riley Cooper was behind Anglin and had a shotgun on Anglin. Id. Covington became angry and asked what was going on, telling them that the police

10

had just passed. Id. At this point Covington looked around to see if anyone else was outside. As he looked behind him, he accidentally bumped into Cooper, who had stopped in front of Covington, and into the butt of the shotgun held by Cooper, causing the shotgun to fire into Anglin. Id.

Trial counsel could not recall with any certainty whether before trial he discussed with Covington whether Covington would testify at trial. (Docket Entry No. 99, Second Supplemental Addendum, Volume I, Addendum No. 1 Post-Conviction Transcript at 44). Covington's trial counsel opines that probably after the state closed its case-in-chief, he told Covington that he "needed to testify." Id. at 43-44. To prepare for his testimony, Covington's counsel believes that before the trial started and while he visited the jail, he gave Covington a copy of the unofficial transcript of the taped conversation with Hill and pointed out possible areas upon which the prosecution would focus. Id. at p. 44. Howell considered Covington "the best criminal defendant witness I've ever had in 12 years of practice." Id. at p. 61.

According to Covington, he did not want nor expect to testify at trial and had only a few minutes notice before he took the stand. Id. at p. 75. Covington recalled that his trial counsel advised that he should testify. Id. at 74. According to Covington, his counsel did not provide any preparation, nor explain the hazards of testifying, the corroboration rule nor the charges nor the punishment. Id. at pp. 73, 75, 80, 90. Covington, however, received a preliminary hearing transcript and a transcript of the tape from his counsel who pointed out to Covington "a few facts of what I said on the tape." Id. at 74, 86. Covington asserts that he lacked sufficient information for a reasoned decision to testify and, if he had been properly advised, he would not have testified at his trial. Id. at pp. 80, 91- 93.

11

## 5. Handwritten amendment to the indictment

At trial, the indictment charged Covington with premeditated, first-degree murder. At an unknown time before consideration by the jury, the indictment was amended by hand, changing the charge to felony-murder from first-degree premeditated murder. (Docket Entry No. 12, Addendum No. 8, Appendix 2 thereto). The indictment reads, in relevant part:

FILED

OCT 17 1990

TIME _____

JOE H. SCOTT
CIRCUIT COURT CLERK
MAURY COUNTY, TENN

STATE OF TENNESSEE, _____ MAURY _____ COUNTY

CRIMINAL DOCKET NUMBER: _____ 6477 _____

The Grand Jurors of _____ Maury _____ County, Tennessee, duly impaneled, and sworn upon their oath, present: That __ Raymond Lewis Covington _____ on or about the __14th__ day of ____ April ____, 19 _79_, in ___ Maury ___ County, Tennessee and before the finding of this indictment, did unlawfully ~~and~~ feloniously, ~~willfully, deliberately, maliciously and premeditatedly and of malice aforethought~~, kill and murder Ernie C. Anglin, in violation of Tennessee Code Annotated 39-2-202, ~~and such~~ *during the* *perpetration of robbery,* ~~with~~ *TH* ~~felonious act was committed~~ by the use of a firearm; all of which is against the peace and dignity of the State of Tennessee.

_Mike Bottoms_

MIKE BOTTOMS
District Attorney General

12

Precisely when this amendment was added is unclear, but the trial court's remarks reflect that this amendent was accomplished before the <u>voir dire</u> of the jury. See Docket Entry No 99, Attachment thereto, Supplemental Addendum No 2 at p 2.

As discussed <u>infra</u>, this change relieved the prosecution of its duty to prove that Covington had specific intent to kill and that he had exhibited premeditation and deliberation. Covington never consented to this amendment. According to Covington, Howell did not explain the amendment of the indictment to him. (Docket Entry No 99, Addendum No 2 at p 78). Covington's counsel testified that he does not remember the change in the indictment, <u>Id.</u> at p 41, but knew from the start of trial that the state's theory was felony murder. <u>Id.</u> at p 42. Later, on cross-examination, Covington's counsel stated that the felony murder charge under the 1979 statute tended to favor the defense by allowing the judge to sentence. <u>Id.</u> at 60. The State ties the handwritten amendment to trial counsel's determination that Covington would benefit from a waiver of jury sentencing. Respondent's Memorandum of Law at 12-13.

The jury instructions conformed to the amended indictment and, in relevant part, were as follows:

> The Defendant is charged in Count 1 of this indictment with felony first degree murder in perpetration of a robbery.
>
> A person commits first degree murder of, or attempt to perpetrate any felony. Robbery is such a felony.
>
> Robbery is the felonious and forcible taking from the person of another, goods or money of any value, by the violence or putting the person in fear.
>
> For you to find the defendant guilty of ,this offense, the state must have proven, beyond a reasonable doubt, the existence of the following essential elements: one, that the defendant unlawfully killed the alleged victim; two, that the- killing was committed in the perpetration of or the attempt to perpetrate the

13

alleged robbery; that is, that the killing was closely connected to the alleged robbery, and was not a separate, distinct, and independent event, and three, that the defendant specifically intended to commit the alleged robbery.

If you should find that the above-three elements exist, beyond a reasonable doubt, it is not necessary that the State prove an intention to kill, or that the alleged killing was done willfully, deliberately, with premeditation, and-with malice. If you find further proof, beyond a reasonable doubt, that the defendant is guilty of murder in the first degree, you will so report, and your verdict in that event shall be: "We, the Jury, find the defendant guilty of murder in the first degree."

(Docket Entry No. 12, Addendum 8, Attach thereto, Exhibit 2 thereto, Transcript at 452).

The punishment for this offense is life imprisonment or death by electrocution, but the State did not request the death penalty, nor allege any statutory aggravating circumstances that would invoke the death penalty. Covington expected to get probation, but received a life sentence. Id. at p. 75.

## B. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding:

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a

14

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id.

Moreover, the Supreme Court stated that under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. Yet, the Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

To prevail on his claims of ineffective assistance, Covington must demonstrate that, under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the

15

defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. 466 U.S. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id at 690-91.

A court must examine not only to the individual errors of counsel, but must also view the

effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000WL712376 *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Covington must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694. Thus, Covington "need not show that he could not have been convicted. He need only undermine our confidence in the trial's outcome." Foster, 9 F.2d at 726 (8th Cir. 1993).

As to his failure to enhance the tape, Covington's trial counsel's view of the tape was that, if enhanced, the tape may contain more incriminating evidence against Covington. The Tennessee Court of Criminal Appeals found that defense counsel was able to make effective use of the tape. Covington has not shown that if the tape were enhanced, the result would have disclosed exculpatory evidence. As to this claim, the Court concludes that Covington has not shown any prejudice.

As to the failure to interview witnesses, the duty to investigate arises from "counsel's basic function, which is 'to make the adversarial testing process work in the particular case,'" Towns v. Smith, 395 F.3d 251, 258 (6th Cir. 2005), including interviews of witnesses who may have information concerning guilt or innocence of the Defendant or attempts to interview eyewitnesses as well as any co-defendant. Id. Failure to do so can constitute ineffective

17

assistance of counsel. Bryant v. Scott, 28 F.3d 1411 (5th Cir. 1994); See also Martinez-Macias v. Collins, 979 F.2d 1067 (5th Cir. 1991) (counsel ineffective for failing to call a disinterested alibi witness); Griffin v. Warden, 970 F.2d 1355 (4th Cir. 1992) (counsel ineffective for failure to contact robbery defendant's alibi witnesses); Workman v. Tate, 957 F.2d 1339 (6th Cir. 1992) (counsel ineffective for failing to contact two witnesses who would have contradicted the testimony of police officers). Yet, defense counsel is not required "to call or interview a witness whose testimony would not have exculpated the Defendant." Millender v. Adams, 376 F.3d 520, 526 (6th Cir. 2004) (quoting Millender v. Adams, 187 F. Supp.2d 852, 877 (E.D. Mich. 2002)).

Here, trial counsel failed to interview Hill, the state's key witness, but he had copies of Hill's interview with officers, Hill's preliminary hearing transcript and transcript of the Hill-Covington tape. Counsel researched information about Hill's criminal history. As to Bondurant and others who knew Hill, the Tennessee Court of Criminal Appeals found counsel's decision not to subpoena Pete Bondurant was a strategic decision. Counsel decided not to call Bondurant because he "was the most famous murderer in this area for several years back." (Docket Entry No. 99, Addendum No. 1 at p. 56). In the Court's view, Covington's counsel's decision not to call Bondurant was a strategic decision. Yet, Covington's trial counsel does not explain why he did not seek out other inmates at the jail about Hill's comments, particularly given that as the State's principal witness, Hill's credibility was at issue. In any event, given that counsel had the cross-examination of Hill at the preliminary hearing, his copy of Hill's interview with officers and Hill's criminal history, the decision not to seek out additional impeachment material can reasonably qualify as a strategic decision.

Covington's next claim is that it was ineffective assistance for his counsel to advise him

18

to testify in this case, and also not to spend sufficient time to prepare him to testify at trial [2]

As to the decision to testify, in <u>Jones v. Barnes</u>, 463 U.S. 745,751 (1983) the Supreme Court explained that: "[i]t is . . recognized that the accused [in a criminal case] has the ultimate authority to make certain fundamental decisions regarding the case, <u>as to whether to</u> plead guilty, waive a jury, <u>testify in his or her own behalf</u>, or take an appeal " (emphasis added). The only clear testimony is that after the State closed its case-in-chief, Covington's counsel told Covington that he "needed to testify " Covington's counsel did not explain to Covington that the decision to testify was Covington's decision, not counsel's. Covington's testimony establishes that prior to the decision to testify, his counsel gave him a transcript of the tape and the preliminary hearing transcript Covington's counsel marked areas of the transcript of the tape that may arise on cross-examination. These facts establish that Covington and his counsel discussed his testifying at trial and his counsel provided some preparation for cross-examination. Whether this level of preparation was adequate must be considered in the context of the issue of the amended indictment and the corroboration rule

Tennessee's corroboration rule requires corroborative evidence before an accomplice's testimony can support a conviction:

> It is well-settled in Tennessee that a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice.
>
> There must be some fact testified to, entirely independent of the accomplice's testimony, which taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also

---

[2] The fact section in Covington's post-conviction papers reflect this claim. <u>Covington</u>, 110 Fed. Appx. at. 666. The Tennessee Court of Criminal appeals did not decide this claim and did not make any findings on whether Covington's counsel was ineffective for failing to prepare Covington to testify at trial. The Sixth Circuit, however, listed this claim for decision on remand <u>Id</u>. at 665-66.

> include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004) (quoting State v. Banes, 57 S.W.3d 411, 419 (Tenn. 2001)and other citations omitted).

Covington argues that at his trial, other than Hill's testimony, the state did not identify Covington as a participant in the robbery-murder of Anglin. Covington testified that his counsel advised him to testify, but did not explain the corroboration rule, namely that Covington's testimony could be used to corroborate Hill's testimony that he was a participant in Anglin's murder. As stated earlier, Covington's counsel failed to inform Covington that it was Covington's decision whether to testify. This omission is aggravated by counsel's failure to inform Covington that under Tennessee's corroboration rule, his testimony could be used to corroborate Hill's testimony and convict him.

The Tennessee Court of Criminal Appeals' opinion does not identify any corroborative evidence that is unrelated to Hill. The Respondent does not identify any such evidence. Yet, the trial transcript reveals that two police officers, J.R. Bailey and Mark Wynn, were present at the time of the Hill-Covington conversation and testified to Covington's statements that he shot Anglin and that there was a robbery of Anglin. (Docket Entry No. 99, Vol I, Addendum No. 2, Trial transcript at pp. 94, 95, 97, 116, 117, and 118).

The Court concludes that while these latter two failures to disclose, i.e., that it was Covington's decision whether to testify and that the Tennessee corroboration rule posed a special risk to Covington, may have resulted in Covington being unable to make a knowing or intelligent decision on whether to testify. Whether the latter omissions establish prejudice on this claim

requires consideration of Petitioner's claim on the amended indictment.

Petitioner's final claim is that his counsel was ineffective for failing to consult with him and allowing an amendment to the indictment without his consent. Petitioner argues that under state procedural law, a material amendment to the indictment required his consent. The relevant rule provides that:

> (b) Amendments of Indictments, Presentments and Information. An indictment, presentment or information may be amended in all cases with the consent of the defendant. If no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment without the defendant's consent before jeopardy attaches.

Tenn. R. Crim. P. 7(b).

Tennessee state courts, however, do not interpret their Rule 7 that the failure to obtain a defendant's consent to an amendment to an indictment in all instances is reversible error, particularly where a new charge was not added, the Defendant was on notice of the charge in the amended indictment and jeopardy had not attached at the time of the amendment. In State v. Fields,1998 WL 79917 (Tenn. Ct. Crim. App. 1998), that Court stated:

> The amendment did not charge a different or an additional offense. The defendant was similarly on notice of the offense and the particular misconduct for which he was charged. There is no indication that the defendant was misled or surprised by the amendment. We find that his trial preparation was not prejudiced. Burkley, 804 S.W.2d 460-61 (Tenn. Ct. Crim. App. 1990); See Harris, 2001 WL 9927 (Tenn. Crim. App. 2001) (While there is not evidence in this record regarding whether the Defendant did or did not consent to the amendment of the indictment, we conclude that the amendment was proper whether or not the Defendant consented because the amended did not charge an additional offense, and the substantial rights of the Defendant were not prejudiced).
>
> * * *
>
> Contrary to defendant's position, the amended indictment did not charge an additional offense. Whether an aggravated assault is "intentional or knowing," or whether it is "reckless," it is still an aggravated assault. The only difference is the punishment.

21

Moreover, amending the indictment served to benefit the defendant as he would have been punished for a Class C felony under the statute in effect at the time of the offense. Instead, defendant was convicted of the Class D reckless aggravated assault.

Id. at *7 [3]

The exceptions to this general rule in Tennessee arise where there is a showing of actual prejudice. See e.g., Bass v. State, 65 Tenn. 579 (1870) wherein, ". . . the element of first-degree murder were not properly alleged in the indictment, making the failure of the indictment to allege the elements of the offense even more egregious." See also State v. Copeland,1995 WL 567312 at 3 (Tenn. Ct. Crim. App. 1995)(citing Bass).

Covington did not consent to this amendment and whether this omission prejudiced his substantial rights requires an analysis of the original charges in the indictment. The elements of first degree murder in Tennessee are defined by statute as follows:

(a) First degree murder is: (1) A premeditated and intentional killing of another;

---

[3]Accord State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987) (where motion to amend granted on day before trial, "the amendment did not allege an additional or different offense, . . . and the appellant was not prejudiced by the amendment"). See also State v. Carter,1996 WL 417669, *2 (Tenn. Ct. Crim. App. 1996) ("The general rule is that amendment to correct errors in the victim's names are permissible. Here, it is indisputable that Appellant was on notice of the offense and the particular misconduct for which he was charged. We therefore find that the trial court's decision to allow the amendment to Appellant's indictment was proper."); State v. McFarland, 1995 WL 301447, *2 (Tenn. Ct. Crim. App. 1995) ("The defendant has not demonstrated to this Court how his rights were prejudiced. After the State moved and was granted permission to amend the indictment, the trial was postponed for more than one month, giving the defendant ample time to prepare his defense. This is especially true in this case where the amended charge did not result in a charge for a different offense."); State v. Watson, 1991 WL 153017, *4 (Tenn. Ct. Crim. App. 1991); State v. Joslin, 1990 WL 199900, *2 (Tenn. Ct. Crim. App. 1990) ("Contrary to the argument advanced by the appellant, the indictment did not charge a new or different offense after it was amended. The elements of the offense for driving while under the influence are the same if a defendant operates a motor vehicle on a public or one of the other locations designated in the statute."); State v. Tesneary,1989 WL 83320, *1 (Tenn. Ct. Crim. App. 1989) ("The conditions of the Rule were met: jeopardy had not attached, no additional or different offense was charged, and the right of the accused were not prejudiced.")

22

or (2) <u>A killing of another committed in the perpetration</u> of or attempt to perpetrate . . . <u>any robbery.</u>

(b) No culpable mental state is required for conviction under subdivision (a)(2) or (a)(3) except the intent to commit the enumerated offenses or acts in such subdivisions.

Tenn. Code Ann. § 39-13-202 (emphasis added)

Thus, "Tennessee has a single first degree murder statute that encompasses premeditated murder and felony murder." <u>State v. Ely</u>, 48 S.W.3d 710, 721 (Tenn. 2001). Yet, Tennessee courts have noted the differences in the elements of first degree murder for premeditated murder and felony murder.

> Premeditated murder and felony murder are not designated by that statute as separate and distinct offenses but rather as alternative means by which criminal liability for first degree murder may be imposed.
>
> The mental state required for the commission of felony murder is intent to commit the alleged felony. Tenn. Code Ann. § 39-13-202(b). While this is a *different* mental state than that required for premeditated murder, in terms of culpability it equates with the intent required for the commission of premeditated murder. Under our statutory scheme, one who commits felony murder is held to the same level of culpability as one who commits premeditated murder. Both are subject to punishment by death, life in prison without parole, or life imprisonment with parole.

<u>Id.</u> For felony murder, Tennessee law also requires consideration of whether "[t]he killing and the felony are closely connected in time, place, causation, and continuity of action." <u>State v. Pierce</u>, 23 S.W3d 289, 294 (Tenn. 2000).

Here, with the amendment, the State did not have to prove premeditation or the specific intent element of first degree murder charge in the original indictment. The elements of a felony murder were not set forth in the indictment returned by the grand jury. Covington was not found guilty of the specific crime for which he was indicted by the grand jury. Yet, the offenses are the same crime, with a different punishment. Under <u>Fields</u>, this amendment did not change the

23

core offense with which the Defendant was charged and convicted. Covington's trial counsel was aware of the amended charge and prepared his defense for that charge. These facts establish some notice and the lack of prejudice. Thus, under Tennessee law, there is not a violation of Rule 7, but his conclusion does not justify nor resolve the issue of Covington's counsel's failure to discuss with Covington that he had the right under the rule to insist upon his consent to the amendment.

As to federal law, the Indictment Clause of the Fifth Amendment requires that a defendant be charged only with crimes brought before a grand jury, United States v. Superior Growers Supply, Inc., 982 F.2d 173, 176 n.3 (6th Cir. 1993), but as a general rule, this clause has not been applied to the states. Jones v. Reese, 546 F.2d 325, 327-28 (9th Cir. 1976). Moreover, as a general rule, habeas claims about state indictments are not cognizable federal law claims. Knewel v. Egan, 268 U.S. 442, 446 (1925); Burrows v. Engle, 545 F.2d 552, 553 (6th Cir. 1976).

An exception to this general rule is that the Sixth Amendment requires a state defendant to be adequately informed of the charges against him, and claims for failure to do so can be grounds for federal habeas relief upon a showing of prejudice. Warner v. Zent, 997 F.2d 116, 128-29 (6th Cir. 1993) (state indictment naming the dates and amounts of illegal transactions was sufficient and there was no showing of prejudice), Martin v. Kassulke, 970 F.2d 1539 (6th Cir. 1992) (the difference between an indictment for rape by forcible compulsion and the State's proof of rape by physical helplessness is not material under Kentucky law) (citing United States v. Ford, 872 F.2d 1231, 1235 (6th Cir. 1989).

Moreover, any amendment of an indictment by the proof presented at trial, and/or the jury charge, that effectively alters the substance of the indictment, can be prejudicial because the amendment may have caused the defendant to be convicted on a charge other than the one in the

24

indictment. Martin, 970 F.2d at 1543, citing inter alia, United States v. Hathaway, 789 F.2d 902, 910 (6th Cir. 1986). A variance between an indictment and the proof at trial can be actionable as a habeas claim, but the variance must be material and there must be a showing of prejudice. Martin, 970 F.2d at 1542. To be material and prejudicial, the variance must either "mislead[] the accused in making [a] defense or expose[] [the defendant] to the danger of double jeopardy." Id. at 1543.

The Sixth Circuit noted the differences significant between a variance and an amendment to an indictment.

> " '[A]n amendment involves a change, whether literal or in effect, in the terms of the indictment.' " In contrast, " '[a] variance occurs when "the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." ' " Id. If a variance infringes too strongly upon the defendant's Sixth Amendment right to be informed of the nature and cause of the accusation, the variance is considered a "constructive amendment." A constructive amendment occurs when " 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.' " Both amendments and constructive amendments are considered per se prejudicial and warrant reversal. The harmless error test generally applies to variances.

United States v. Prince, 214 F.3d 740, 756-57, (6th Cir. 2000); (quoting United States v. Barrow, 118 F.3d 482, 488 (6th Cir. 1997) and United States v. Manning, 142 F.3d 336, 339(6th Cir. 1998).

Prince also explained the purposes of actual and constructive amendments and how to evaluate the error.

> A substantial right is affected only when the defendant establishes prejudice in his ability to defend himself or to the overall fairness of the trial. The purposes underlying the rule against amendments and constructive

25

amendments include notice to the defendant of the charges he will face at trial, notice to the court so that it may determine if the alleged facts are sufficient in law to support a conviction, prevention of further prosecution for the same offense, and finally, of "paramount importance," the assurance that a group of citizens independent of prosecutors or law enforcement officials have reviewed the allegations and determined that the case is worthy of being presented to a jury for a determination of the defendant's guilt or innocence

Id. at 757 (citations omitted).

Later, the Sixth Circuit stated the "key question" in Prince is "whether the jury instructions and the evidence introduced another crime or an alternative method [] by which the one crime . . . could have been committed." United States v. Suarez, 263 F.3d 468, 478 (6th Cir. 2001).

Applying Tennessee and federal law because the amendment occurred before the petit jury was impaneled, jeopardy had not attached. Serfuss v. United States, 420 U.S. 377, 388 (1975). But without proof that Covington's counsel or the trial court informed Covington of the amendment, the notice requirement of the Indictment Clause was frustrated. Aside from whether Rule 7 was violated, given the significance of an amendment that changed the elements of the offense, counsel's failure to so inform Covington constitutes ineffective assistance. It is fundamental that the Defendant's counsel advise his or her client of the elements of the offense charged and for which the Defendant will be tried.

Whether prejudice arises from the cumulative effects of counsel's omissions, as to counsel's lack of advice on Covington's testifying, there was some discussion and preparation of Covington to testify at trial, with counsel providing the transcripts of the preliminary hearing and the tape recording as well as counsel's selective references to those documents. Once the premeditation element was dropped, Covington's explanation of how the shooting occurred was

26

immaterial as the State no longer had to prove premeditation. Without the premeditation element, the trial would not have been different given the corroborative testimony of the two police officers about Covington's admissions to the robbery-killing of Anglin. With the cited corroboration rule and the record, Covington's testimony would not necessarily be in corroboration of Hill's testimony. Covington's counsel testified that he knew from the beginning that the State's theory was felony murder. Covington was convicted of the same offense for which he was originally charged. Under Tennessee precedents, Covington's lack of consent to the amendment was not prejudicial. The Court finds deficiencies in Covington's trial counsel's performance, but given the State's proof, the Court is unable to find prejudice or have serious doubts about the jury verdict.

Finally, Covington argues that he was entitled to have a jury determine that he is guilty of every element of the crime with which he was charged, beyond a reasonable doubt, citing Apprendi v. New Jersey, 530 U.S. 466, 476-77 (2000). Yet, given the jury instructions, Covington was convicted of the offense in the amended indictment.

Thus, the Court concludes that the petition for the writ should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _9th_ day of September, 2005.

WILLIAM J. HAYNES, JR.
United States District Judge

Case 1:97-cv-00013   Document 105   Filed 09/09/05   Page 27 of 27 PageID #: 55